The McLEAN HOSPITAL
CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 175–88C.

United States Claims Court.

Sept. 14, 1992.

Kenneth A. Behar, with whom was John D. Steubing, Boston, Mass., for plaintiff.

Donald E. Kinner, Commercial Litigation Branch, with whom were Terrence S. Hartman, Asst. Director, David M. Cohen, Director, and Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case comes before the court on an appeal from the final decision of the Director of the Office of the Civilian Health and Medical Program of the Uniformed Services (OCHAMPUS) denying cost sharing of inpatient psychiatric care provided to Amy W., a thirteen-year-old CHAMPUS beneficiary, for the time period September 1, 1984 to November 9, 1984. Plaintiff McLean Hospital Corporation (McLean) seeks recovery of $37,433.06, which, plaintiff contends, represents OCHAMPUS' portion of reimbursable expenses under the cost-sharing statute. Pending before the court are cross-motions for summary judgment which raise two questions: 1) whether the regulations implementing the waiver standard can be applied retroactively; and 2) whether the OCHAMPUS Final Decision, which denied cost sharing, is supported by substantial evidence.

After careful consideration of the briefs and hearing oral argument, the court concludes that although the regulation may be retroactively applied, the OCHAMPUS Final Decision is not supported by substantial evidence and thus must be reversed. Therefore, for the reasons set forth below, plaintiff's motion for summary judgment is granted.

## FACTS AND STATUTORY HISTORY

Amy W., the CHAMPUS beneficiary in this case, was admitted to McLean for psy-

chiatric treatment. Amy was thirteen years of age. Amy had exhibited violent tendencies since the age of eight, and her admission to McLean was her third inpatient psychiatric hospitalization in her lifetime. Amy's violent behavior included hitting her mother and others, throwing furniture, and at least one occasion of knife-wielding. In April 1983, Amy attempted suicide. The State of Massachusetts, acting on a petition filed by Amy's mother, attempted to place Amy in a residential school. At the admissions interview, Amy physically attacked the interviewer, attempted to light the interviewer's clothes on fire, and ran away from the building. This incident prompted Amy's admission to McLean on October 24, 1983.

Amy remained hospitalized at McLean for over one year. Her treatment included passes home to visit her family. While the ultimate goal of Amy's doctors was to allow her to return to her home and school, the intermediate treatment goal was to move her to a Residential Treatment Center (RTC). On July 20, 1984, the McLean staff began to plan for Amy's eventual transfer to an RTC. Amy remained hospitalized at McLean during this preliminary planning stage, although she was released on weekend passes. In August, Amy's application to an RTC was rejected after she became threatening during an admissions interview. Two other RTC applications were rejected. Amy was accepted into one RTC, but that option was rejected by Amy's physicians because it was located too far from Amy's home to allow for the involvement of Amy's family in her treatment. Family involvement in Amy's treatment was considered essential since most of her acting out was directed toward her mother. Amy was accepted into an appropriate RTC on October 31, and Amy was released from McLean on November 9. Amy began school at the RTC a few days later.

McLean provided Amy with inpatient psychiatric care from October 24, 1983 to November 9, 1984, for a total of 381 days. The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) provides for cost sharing for acute inpatient psychiatric hospital care, 10 U.S.C. § 1079(a), although cost sharing is limited to 60 days per calendar year, 10 U.S.C. § 1079(a)(6). A waiver from the 60-day limit may be permitted where "extraordinary medical or psychological circumstances" exist. 10 U.S.C. § 1079(i)(4).

In 1983, when Amy was first hospitalized, reimbursement for inpatient mental health services was limited to 60 days per patient per year. However, this 60-day limitation did not apply to, among other things:

> inpatient mental health services ... provided as residential treatment care; ... or provided pursuant to a waiver for medical or psychological necessities, granted in accordance with the findings of current peer review, as prescribed in the guidelines established and promulgated by the Director [of OCHAMPUS].

Department of Defense Appropriation Act of 1983, Public Law 97-377, 96 Stat. 1830, § 785. The guidelines, issued by OCHAMPUS on December 29, 1982, provided that waivers of the 60-day limitation could be granted if:

> the patient is suffering from an acute mental disorder or acute exacerbation of a chronic mental disorder which results in the patient being a significant risk to self or of becoming a danger to others; *and* the patient requires a type, level, and intensity of services that can only be provided in an in-patient setting.

CHAMPUS Policy Manual, Vol. I, Chp. I, § 11 (emphasis in original).[1]

In 1984, the statutory language was changed to require the Secretary of Defense to promulgate regulations pertaining to the requirements for "extraordinary ... psychological circumstances." The 1984 statute provided that a waiver may be authorized:

---

1. In March 1983, the guidelines were revised to state that a waiver could be granted where the patient is suffering from an acute mental disorder which "results in the patient being put at a significant risk to self or becoming a danger to others." The parties do not contend that this difference in language changed the meaning of the guidelines.

by the Secretary of Defense because of extraordinary medical or psychological circumstances that are confirmed by a review by a non-federal health professional pursuant to regulations prescribed by the Secretary of Defense.

10 U.S.C. § 1079(i)(4). Regulations were promulgated in January 1986, and were purportedly made retroactive to December 29, 1982. The regulations are virtually identical to the guidelines in effect in 1983, and provide that a waiver may be granted when:

> [t]he patient is suffering from an acute mental disorder or an acute exacerbation of a chronic mental disorder that results in the patient being put at significant risk to self or of becoming a danger to others; *and* the patient requires a type, level, and intensity of otherwise authorized service that can only be provided in an acute care inpatient setting.

32 C.F.R. § 199.4(b)(5)(ix)(B)(1) (1987) (emphasis in original).

OCHAMPUS agreed to cost-share Amy's care provided by McLean for the period of October 24, 1983 through September 1, 1984.[2] McLean's fourth waiver request—for the period between October 1, 1984 and December 31, 1984—was denied. OCHAMPUS refused to cost-share McLean's care of Amy for the period of September 1, 1984 to November 9, 1984. OCHAMPUS' refusal to cost-share for this period is the subject of this litigation.

## DISCUSSION

### I. *Standard of Review*

█ OCHAMPUS decisions are to be reviewed under the standard of review applicable to final administrative actions under the Administrative Procedure Act, 5 U.S.C. § 706. Under that Act, the reviewing court may not substitute its judgment for that of the agency, and is limited to a determination of whether the agency decision is an abuse of discretion, is arbitrary or capricious or otherwise not in accordance with law, is unsupported by substantial evidence, or is in violation of the applicable statute or valid implementing regulation. 5 U.S.C. § 706. *See also King v. United States,* 566 F.2d 1190 (Table), 215 Ct.Cl. 876, 880 (1977); *Prindle v. United States,* 5 Cl.Ct. 493, 497 (1984).

█ Plaintiff contends that the Final Decision of OCHAMPUS is not supported by substantial evidence, and therefore, should be reversed. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). In order to determine whether an agency decision is supported by substantial evidence, the court must consider the record as a whole, taking into account all the evidence in support of the decision, as well as all the evidence contrary to the decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951). Although the court should scrutinize the record before it, the court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). A *de novo* review would be inappropriate, particularly where experts disagree over issues involving professional psychological judgment. *Prindle,* 5 Cl.Ct. at 497; *King,* 215 Ct.Cl. at 879–880.

### II. *Retroactivity of the Regulation*

█ Plaintiff contends that the regulations applied by OCHAMPUS may not be applied because they had not been promul-

---

**2.** Cost-sharing was provided as follows:

1) October 24, 1983 to November 10, 1983—approved sixty days of annual inpatient health care.

2) November 11, 1983 to December 31, 1983—waiver approved.

3) January 1 to February 29, 1984—approved as sixty days of annual inpatient health care.

4) March 1, 1984 to May 29, 1984—waiver approved.

5) May 31, 1984 to September 30, 1984—waiver approved. This waiver approval was later amended to provide cost-sharing only through August 31, 1984.

gated at the time treatment was rendered. In 1983 and 1984, during the time of Amy's treatment, the 1983 CHAMPUS guidelines were in effect. The guidelines allowed the Director of OCHAMPUS to grant a waiver, which would permit cost sharing beyond 60 days, if:

> the patient was suffering from an acute mental disorder or acute exacerbation of a chronic mental disorder which results in the patient being a significant risk to self or of becoming a danger to others. . . .

The applicable regulations were promulgated in 1986, and were purportedly made retroactive to December 1982. The regulations utilized the same standard as that contained in the guidelines of "significant risk to self or of becoming a danger to others."

Plaintiff argues that the standard to be applied to determine whether a waiver should have been granted is, under 10 U.S.C. § 1079(i)(4), whether "extraordinary . . . psychological circumstances" exist which would warrant inpatient care beyond the 60–day limit. Plaintiff argues that neither the regulatory requirement of "risk to self or of becoming a danger to others" nor the comparable language contained in the guidelines could be applied to determine whether the waiver should have been granted, because the regulation could not be applied retroactively and the guidelines were not binding.

The plaintiff's argument must fail. In a different McLean Hospital case, the Claims Court addressed the question of whether the CHAMPUS regulations could be applied retroactively. *McLean Hospital Corp. v. United States*, 18 Cl.Ct. 152 (1989). After noting that regulations "having a retroactive application are permitted" in certain instances, 18 Cl.Ct. at 154, the court discussed the balancing test derived from *Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380 (D.C.Cir.1972). Under that test, the court should consider, among other things, whether the new rule represents an abrupt departure from the prior rule and the degree to which retroactive application of the

rule burdens the party against which the rule is being applied. 466 F.2d at 390. In applying the balancing test, Judge Wiese in the earlier *McLean* case noted that:

> [t]he regulation about which plaintiff complains announces no new standard for the granting of waivers. Rather, that regulation continues in place precisely the same criteria that existed as published CHAMPUS guidelines prior to the regulation's promulgation. Consequently, plaintiff can make no claim that it relied to its detriment on a contrary rule.

18 Cl.Ct. at 154–55. The identical reasoning is applicable here.

Plaintiff argues that the D.C. Circuit, in *Georgetown University Hospital v. Bowen*, 821 F.2d 750 (D.C.Cir.1987), *aff'd*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), concluded that equitable considerations, such as those expressed in *Retail*, are irrelevant because the Administrative Procedure Act (APA) prohibits retroactive application of a regulation. 821 F.2d at 757. This court, however, does not read *Georgetown* so broadly. Although the D.C. Circuit's opinion was affirmed by the Supreme Court, the Supreme Court limited its analysis to the Medicare Act, and did not discuss the validity of the *Retail* balancing test or the retroactivity of regulations under the APA. In addition, *Georgetown* may be distinguished from the case here. In *Georgetown*, the plaintiff had detrimentally relied on the prior regulation. Here, in contrast, not only did the plaintiff fail to prove detrimental reliance, but the plaintiff did not, and cannot, distinguish the regulation from the guidelines.

Thus, the court finds that the OCHAMPUS regulation may be applied retroactively here. This is especially true in light of the fact that the language of the regulation is practically identical to that of the guidelines. That language provides that a waiver may be granted if the patient poses a "significant risk" to herself or to others.

### III. *Review of OCHAMPUS Final Decision*

McLean argues that the OCHAMPUS Final Decision is not supported by substantial

evidence because it did not adequately analyze Amy's actions and needs in light of her prior history, did not accord sufficient weight to the reports of Amy's treating physicians, and did not apply the appropriate waiver standard.

### A. Application of Improper Waiver Standard

■ McLean first argues that OCHAMPUS applied an improper waiver standard when they relied upon the reports of the peer reviewers that concluded that Amy was not entitled to cost-sharing because she was not a "clear and present danger" to herself or others. They argue that OCHAMPUS should have applied the standard of whether Amy represented a "significant risk" to herself or others. The government contends that OCHAMPUS considers a patient who has been classified as a "significant risk" as a "clear and present danger," and thus, that the standards are comparable.[3] The government maintains that only those patients who are a current risk to themselves or others at the time of the review qualify under the waiver requirement.

The applicable regulation for granting a waiver requires that a patient pose a "significant risk to self or of becoming a danger to others." Plaintiff argues that the "clear and present danger" standard utilized by the peer reviewers implies that an *immediate* risk must exist, while the "significant risk" standard encompasses either an *immediate or a future* risk of harm. OCHAMPUS, in requiring that a patient present an immediate risk before a waiver is granted, holds a patient to a higher standard than that required under the regulation.

■ Ordinarily an agency's interpretation of its own rules is to be accorded substantial deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, deference should not be given when the agency's interpretation is contrary to the plain meaning of the regulation. *See, e.g., Gar-*

*debring v. Jenkins,* 485 U.S. 415, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988). As this court has stated, "to be given that deference, the [agency's] interpretation must have a logical basis either in its past applications, or the unequivocal language used in the regulation itself." *Murphy v. United States,* 22 Cl.Ct. 147, 154 (1990).

The court finds that OCHAMPUS' interpretation of the guidelines or the regulations to require immediate risk, under the "clear and present danger standard," should not be accorded deference because it is contrary to the plain meaning of the language of the guidelines and the regulations. The "clear and present danger" standard is more stringent than the "significant risk" standard. The "clear and present danger" standard implies immediacy. As the government stated, "the concept of an individual being a significant risk to self or others necessarily implies a *present* risk, not merely a future potential of becoming a risk." Defendant's Cross–Motion at 22 (emphasis in original).

The court disagrees. Webster's Dictionary defines "risk" as "the chance of injury, damage, or loss." "Significant" is defined as "having or likely to have influence or effect." Clearly, the term "significant risk" encompasses the potential for causing harm in the future as well as in the present. Therefore, the court finds that the plain meaning of "significant risk" is that a waiver could be granted if a patient poses a real present *or* future risk.

In light of the fact that the peer reviewers and the hearing officer utilized a standard of evaluation that was more stringent than that required under the guidelines or the regulations, the court must disregard the decision of OCHAMPUS insofar as it incorporates the "clear and present danger" standard and does not analyze the potential for Amy's future behavior. The court notes that it is not necessary to disregard the decision of OCHAMPUS or the reports of the peer reviewers' in their entirety. The descriptions and conclusions

---

**3.** The court notes that "significant risk" is not    defined in the OCHAMPUS decision.

concerning Amy's mental state may be considered separately.

## B. The OCHAMPUS Final Decision and the Recommended Decision of the Hearing Officer.

■ The hearing officer, whose recommended decision was adopted in part by OCHAMPUS as the Final Decision, relied heavily on the reports of the peer reviewers[4] and Doctor Kolb (the Assistant Medical Director at OCHAMPUS). Also considered was the testimony of Doctor Shingleton (a psychiatrist at McLean), Doctor Sotsky (Amy's treating physician at McLean), and Dr. Saltzman (director of the children's center at McLean). The OCHAMPUS decision concluded that the inpatient treatment provided for Amy by McLean after August 31, 1984 was not medically necessary nor was it the appropriate level of care. The decision stated that Amy "was not suffering from a mental disorder or an acute exacerbation of a chronic mental disorder, which resulted in her being put at a significant risk to herself, or becoming a danger to others," after August 31, 1984. As a consequence, OCHAMPUS denied cost-sharing of the acute inpatient psychiatric hospital care for the period between September 1, 1984 through November 9, 1984. Plaintiff argues that the decision appears to disregard the opinions of Amy's treating physicians in favor of those of the peer reviewers and the Assistant Medical Director at OCHAMPUS.[5]

The court holds that the OCHAMPUS decision is not supported by substantial evidence, and therefore must be reversed.

The court notes that the mere presence of evidence which is contrary to the OCHAMPUS decision does not empower the court to alter an administrative decision. However, where there is insufficient evidence to support the decision, the court has no choice but to revisit the administrative determination. While a court should always be reluctant to do this, to find otherwise would render judicial review meaningless.

The court finds that OCHAMPUS did not sufficiently consider the opinions of the treating physicians in analyzing Amy's past behavior, most notably the knife-wielding incident that occurred two months prior to the October 26, 1984 determination that Amy was not a significant risk. This court has noted in an analogous OCHAMPUS case:

> The ultimate question to be answered was whether the patient represented a significant danger to [herself] or to others. Therefore, the matter in debate between [the treating physicians and the peer reviewers] was the *meaning* of the patient's upheavals, not the frequency of their occurrence or their amenability to control in a hospital environment.

*McLean*, 18 Cl.Ct. at 159 (emphasis added). In other words, the experts needed to examine the situations that triggered Amy's violent behavior, her actual responses and ability to cope, and her likely response when faced with similar situations in the future. The court finds that OCHAMPUS did not correctly interpret the evidence that was before it, and that the overwhelming weight of the evidence suggests that Amy was a significant risk at the time in ques-

---

**4.** A peer reviewer is a psychiatrist whose knowledge of the patient is drawn exclusively from the patient's medical records.

**5.** Plaintiff argues that the "treating physician rule" should have been applied here. That rule provides that, where a case involves a disagreement between the professional opinion of the patient's treating physician and that of a peer reviewer who relies principally on medical records, the professional opinion of the patient's treating physician is to be given controlling weight unless substantial evidence exists to the contrary. The government responds that the treating physician rule is contrary to the congressional intent behind the applicable statutory language. The statute provides that a waiver of

the 60–day limit is appropriate where "extraordinary medical or psychological circumstances [exist] that are confirmed by a review by a nonfederal health professional." 10 U.S.C. § 1079(i)(4). The government argues that the treating physician rule would clearly violate Congress' direction to base CHAMPUS waiver determinations upon reviews by non-federal health professionals.

It is not necessary for the court to reach the issue of whether the treating physician rule may be applied in CHAMPUS hearings, because the court finds that, when considering all the evidence under review by OCHAMPUS, the decision is not supported by substantial evidence.

tion. A few specific occurrences are discussed more fully below. In addition, OCHAMPUS did not consider what Amy's reaction to her transfer to an RTC was likely to be, given her prior reaction to analogous situations in the past. The court finds that such evidence is extremely important to determining whether Amy was a significant risk as of September 1, 1984 and thus must be considered.

1. *Prior experience of attempted discharge from hospital and attempted admission to RTC*

The treating physicians were specifically concerned with whether Amy would have been a significant risk when faced with discharge from the hospital and transfer to an RTC. Amy's treating physicians believed that there was a high potential for Amy to pose a significant risk to herself and others at the time at issue here. Amy was most at risk to revert to violent behavior during times of transition. Analogous situations in her past should have been considered as indicative of how Amy might have reacted.

When Amy was faced with her discharge from hospitalization prior to the hospitalization at issue here, she attempted suicide through an overdose of medication. In addition, the violent behavior that triggered her admission to McLean occurred in response to her doctor's attempts to place her at an RTC.

2. *The Knife Incident*

On July 7, 1984, Amy, while home on a weekend pass to visit her family, pulled a knife on her mother. The hearing office characterized the incident as follows:

> The knife was pulled briefly and [Amy] was able to calm herself, and returned readily to the hospital, when she cried in shame over what she had done. The manner in which [Amy] resolved the problem demonstrates very strongly to the Hearing Officer the tremendous improvement she had made at McLean and how well she was finally able to control her outbursts.

Recommended Decision at 16. Most of the peer reviewers' reports do not address the incident, even though it occurred less than two months before the reviewers determined that Amy was no longer a significant risk to others. One peer reviewer who did note the incident attempted to minimize the importance of the incident by pointing out that *Amy did not actually use the knife on her mother.*

The nursing notes and the testimony of the treating physicians stand in contrast to the hearing officer's decision. The notes indicate that Amy's mother took the knife from her and that Amy refused to discuss the incident with her mother. Indeed, three days after the incident, Amy initially refused to discuss the incident with her treating physicians, but ultimately agreed to do so. Dr. Sotsky testified at the hearing, with respect to the knife-pulling incident:

> I saw that both as evidence of her dangerousness and also her continued difficulty with change and perceived loss ... which got manifested in terms of being out of the hospital, at home, with her mother.

Hearing Tr. at 65. Dr. Shingleton testified that:

> I think [the Knife incident is] minimized and perhaps even discounted in the reviewer's assessment, [but] we took very seriously as an indication of the patient, again, even in July, even on the medication which she had been on for some time by that time, as *evidence of the potential and capacity for risk to herself and to other people.*

Hearing Tr. at 34–35 (emphasis added).

The court finds that there is no substantial evidence in the record to support the hearing officer's conclusion that Amy was under control when she pulled the knife on her mother. Indeed, there is substantial evidence to the contrary—for example, the assaultive behavior itself and Amy's refusal to discuss the incident for a number of days.

3. *Amy's reaction to rejection from RTC*

McLean began to search for an RTC to which Amy could be moved in July 1984.

That process required that Amy be interviewed by the prospective schools. In August 1984, Amy interviewed at the Concord–Assabett School. The record indicates that Amy, during the interview, became "withdrawn, restrictive, disorganized [and] cognitively destabilized" as well as "argumentative, oppositional, and threatening." As a consequence, Amy's application was rejected. On September 2, 1984, Amy was returned early to McLean from an overnight pass due to assaultive behavior. (The court notes that the hearing officer determined that Amy was not a significant risk to herself or others as of September 1, 1984.) The treating physicians viewed Amy's violent behavior as a reaction to her rejection from the RTC. The treating physicians concluded that the fact that Amy did not become overly violent at this time could be attributed to the fact that Amy was promptly returned to the structured, inpatient setting offered by McLean.

The court finds this incident compelling for the purpose of determining that Amy *was* a significant risk to herself and to others at the time in question. Clearly, Amy could not have been transferred to an RTC at this time, and the Hearing Officer's conclusions to the contrary lack any significant evidence to support them.

4. *Weekend Passes and McLean's Search For an Appropriate RTC*

The peer reviewers and the hearing officer placed great emphasis on the fact that Amy was able to leave the hospital on overnight passes with her mother and that McLean was actively seeking an appropriate RTC to which Amy could be transferred. With respect to the overnight passes, the hearing officer noted that Amy was allowed weekend passes to go home throughout her treatment at McLean, and particularly relied on the finding of one of the peer reviewers that Amy "could not be considered a serious danger to herself or others and still have functioned so well on so many passes out of the hospital with her mother." Recommended Decision at 17.

This finding is in conflict with the testimony of the treating physicians, who viewed the passes as part of the treatment plan and not as evidence that she was ready to be transferred to a lower care facility. Dr. Shingleton testified:

> Passes with families are felt to be part of the treatment.... [T]he pass is not simply a blanket statement that the patient doesn't need to be in the hospital, but is part of the treatment.... [C]ontact with the family is used to make treatment decisions or dispositional decisions.

Hearing Tr. at 39–40. Dr. Sotsky testified that one reason that the overnight passes were possible was the fact that Amy could be returned immediately to the hospital if her behavior became inappropriate. In fact, Amy's violent behavior led her mother to return her to the hospital early from her weekend passes a number of times.

The court finds no substantial evidence to support the hearing officer's conclusion that the fact that McLean issued overnight passes to Amy necessarily led to the conclusion that Amy was not a significant risk. Indeed, the record shows that, on occasion, Amy's behavior while out of the hospital on a pass clearly indicates that Amy *was* a significant risk to herself or others. (The court especially notes the knife incident, which occurred while Amy was home on a weekend pass.) The court also would like to emphasize the uncontroverted testimony of the treating physicians that the issuance of the passes was considered part of the treatment itself, and was not dispositive of whether she was able to leave McLean for good.

With respect to McLean's search for an appropriate RTC to which Amy could be transferred, the hearing officer stated that "[t]his search for an appropriate RTC evidences [Amy's] readiness to be transferred to an RTC level of care." Recommended Decision at 21. The treating physicians, however, viewed the search for an RTC and the interview process as a means to determine whether Amy was in fact ready to be transferred. For example, Dr. Shingleton testified that Amy's inappropriate behavior during the admissions interview in August 1984 was an indication of her lack of readi-

ness to be transferred. Dr. Shingleton stated that:

> [At] the interview, ... [where Amy] did become withdrawn, restrictive, disorganized, cognitively destabilized ..., [t]his was taken as significant evidence on our part, clinically, that suggested she indeed was not ready at that time for imminent transfer to a residential setting.

Hearing Tr. at 30. In addition, as discussed earlier, Amy resorted to violent behavior when her application to an RTC was rejected in late August. Dr. Shingleton testified:

> [Amy's] reaction to the non-acceptance, to her rejection, and subsequent events which occurred after, suggested to us that she was indeed not ready yet.

Hearing Tr. at 29. Dr. Sotsky also testified that the fact that the treatment plan included a goal of placement in an RTC did not necessarily mean that Amy was ready to be transferred. Dr. Sotsky noted that Amy was unable to discuss her discharge from McLean and her transfer to an RTC until mid-October of 1984.

The court finds that there is insufficient evidence in the record to support the hearing officer's conclusion. The fact that McLean was searching for an appropriate RTC did not indicate that Amy was ready to be transferred as of that time. This is particularly true in light of the substantial record evidence that Amy's interviews at RTCs, as well as the actual search for an appropriate RTC, were considered a part of Amy's treatment. For example, during the hearing, Dr. Shingleton testified concerning Amy's progress as of the summer of 1984:

> She had stabilized sufficiently to make it realistic to begin considering residential alternatives.... [O]ur sense was that *this did not necessarily imply that she was ready at the time that these possibilities were being considered.*

Hearing Tr. at 38 (emphasis added). Dr. Shingleton also noted that:

> [Amy's] readiness to be transferred to a residential setting is an ongoing series of interviews, an ongoing process, which we felt relied heavily on her response to

various interviews with people of residential settings.

Hearing Tr. at 29. The court also notes that Amy's response during and after the Concord–Assabett interview indicated that Amy was not ready to be transferred at that time. The court finds that, although the treating physicians were attempting to locate an RTC to which Amy could be transferred prior to September 1, this does not imply that Amy was ready to be transferred. The treating physicians retained the option of refusing to transfer Amy, even if an RTC had been found, if they did not consider it appropriate treatment *at that time.*

Defendant points to Dr. Sotsky's testimony concerning whether Amy was ready to be discharged as of September 1, where Dr. Sotsky stated:

> [I]f there was an appropriately structured residential school in which [the beneficiary] could receive what was a very individualized academic progress ... and ... continued family treatment ... and individual treatment ... then my answer would be yes.

Hearing Tr. at 71. The court notes, however, that if all of these factors were not present, then Amy could have reacted in such a way that she would have been a significant risk to herself or others. Of course, these factors were not present until November 9, 1984.

## C. Necessity for Type, Level, and Intensity of Services

Under the OCHAMPUS guidelines, in order for a waiver to be granted, the patient must "require[ ] a type, level, and intensity of services that can only be provided in an in-patient setting." The Hearing Officer, in his Recommended Decision, concluded that:

> [Amy] was not suicidal and not a significant risk to herself or others and could have been in a less structured environment. This is not to say that [Amy] did not need continued supervision and treatment but the Hearing Officer is satisfied that this type of treatment did not have to be in an inpatient hospital setting.

Recommended Decision at 18. The Hearing Officer relied primarily on the reports of the peer reviewers, who concluded that, although the care Amy received through August 31, 1984 was medically necessary, after that date:

> [Amy] was not a serious risk to herself or others as to be incapable of being adequately managed in an RTC environment, and the inpatient hospital setting was not the appropriate level of care after August 31, 1984.

Recommended Decision at 20. Similarly, the OCHAMPUS final decision concluded that:

> after August 31, 1984, the inpatient level of care was not the appropriate level of care [and] after that date [Amy] could have been appropriately treated in a residential care setting.

Final Decision at 2.

This court concludes that the agency decision and the findings of the peer reviewers were contrary to the great weight of the evidence, and that Amy *was* a significant risk at the time in question. The court also concludes, with respect to the question whether Amy was receiving the proper level of care, that the significant weight of the evidence leads to the conclusion that Amy needed to be at McLean through November 9, 1984. As discussed earlier, even if Amy's treating physicians had located an appropriate RTC to which Amy could be transferred, they reserved the right to refuse to transfer her at that time if her violent behavior resurfaced. Indeed, at the time in question, Amy interviewed at the Concord–Assabett RTC. During the interview Amy "became withdrawn, restrictive, disorganized, [and] cognitively destabilized," Hearing Tr. at 30, which resulted in her application being denied. Dr. Sotsky testified:

> [I]n [Amy's] being rejected at Concord [Assabett], I think we learned that she was not yet ready for residential treatment at that time. It was not just a matter of that not being the right place.

Hearing Tr. at 77. The court finds that, even if Amy had not been rejected from the RTC at that time, it would have been reasonable for her doctors to refuse to transfer her in light of her behavior.

The peer reviewers and the treating physicians were in agreement that Amy was not ready to be transferred home as of August 31, 1984. The two options available to her were continued treatment at McLean or transfer to an RTC. However, the option of an RTC was only viable if an appropriate RTC was located *and* Amy was sufficiently stable to be transferred at that time. Clearly, the evidence shows that Amy was not ready to be transferred to an RTC as of August 31, 1984. Dr. Sotsky noted that Amy was unable to discuss leaving McLean until mid-October, which indicated to Amy's doctors that she was not ready to be transferred. Dr. Shingleton testified that:

> My sense clinically is that to have her discharged on September 1st would have been like throwing her to the dogs.

Hearing Tr. at 31. In response to the Hearing Officer's question whether Amy could have been transferred on September 1 if the RTC had accepted her application, Dr. Shingleton stated:

> If they had accepted her at that time, and our sense based on mental examinations, which were documented on the charts, was that if she did not pose a risk to herself or others, then we would deem her appropriate for transfer to that setting. However, her reaction to the nonacceptance, to her rejection, and subsequent events which occurred after, suggested to us that she was indeed not ready yet.

Hearing Tr. at 29. Dr. Sotsky testified:

> If, in fact, she did not become cognitively constricted at that time, threatening and abusive, I think our prediction and what we saw was that she did. That that did happen. I think likewise we would have been at any point in time cautious and careful and thoughtful about a transition.

Hearing Tr. at 84.

The court finds that Amy's treatment at McLean from September 1 through November 9, 1984 was the "type, level, and intensity of services" that was required for

Amy's well-being, and that McLean is entitled to receive cost-sharing reimbursement for that period of time. The court finds that although Amy's treating physicians were searching for an RTC to which Amy could be transferred, this fact did not imply that Amy was able to be transferred even if an appropriate RTC had been located.

## CONCLUSION

For the reasons set forth above, the court holds that the CHAMPUS regulations may be applied retroactively in this case, and that a waiver may be granted. Thus, cost-sharing may be allowed if the patient poses a "significant risk" to herself or to others. The court also holds that the OCHAMPUS Final Decision was not supported by substantial evidence, and therefore, it must be reversed. The court finds that from September 1, 1984 through November 9, 1984 Amy continued to suffer from an acute mental disorder which resulted in Amy being put at a significant risk to herself and to others. She required inpatient hospitalization until an appropriate RTC was located to which Amy could be transferred and until Amy was sufficiently stable to be transferred. Furthermore, the treatment that Amy received at McLean was the "type, level, and intensity of services" that were required.

The court grants Plaintiff's motion for summary judgment and denies Defendant's cross-motion for summary judgment. The clerk is directed to enter judgment for plaintiff in the amount of $37,433.06.

IT IS SO ORDERED.